May it please the Court, my name is Henry Quillen and I represent the appellant Air Evac EMS. I'd like to ground my discussion today in a specific example of a reimbursement of the kind we're talking about. In 2015, a child in rural Arkansas was thrown from a dirt bike at high speed. He went to the local hospital where the doctor discovered severe internal injuries and ordered that he be flown via air to Children's Hospital in Little Rock. Now the child was insured by Blue Cross, which despite federal and state regulations requiring it to do so, does not create a network of air ambulance transportation. It has no in-network providers. So Air Evac, an out-of-network provider, was called to transport the child to Children's Hospital. Air Evac's charge was about $45,000, and there are good reasons why that number is so high, which I'd be happy to talk about, but the reasonableness of that figure is not at issue on appeal. What is at issue is how Blue Cross pays for the service. ERISA requires Blue Cross to pay at least what Medicare would have paid, which in this case is about $8,700. And Arkansas regulations require that when someone uses an out-of-network provider because no in-network provider is available, they shouldn't pay any more than they would have paid for an in-network provider, which in this case would leave the child's family liable for their copayment, coinsurance, and deductible because an in-network provider can't balance bill, that is, charge the difference between its regular price and what it got from the insurance company. Here's what Blue Cross did instead. It paid $1,000, and it left the family liable for a balance bill of $44,000. This violated ERISA because the payment was lower than Medicare would have paid, and it violated Arkansas regulations because it left the family liable for more than their copayment, coinsurance, and deductible. The overarching question on... How much would the AIRVAC company have gotten in your example? They ultimately settled the case for... No, but I mean, no, under your example of the in-network provider, so they're zoning the coinsurance, what would that reimbursement have been? If they truly were an in-network provider, then they would have agreed with the insurance company to accept a negotiated amount and not bill the patient for any more than that. But I thought you said you don't negotiate these, these are set federally, and you go by what's set federally, and it preempts everything, state, federal. They are set federally for Medicare and Medicaid. Okay, thank you. Yeah, but not for private insurance. Makes sense. Go ahead. Okay, so the overarching question is, if Blue Cross is making these unlawfully low payments, do the patient or AIRVAC have any remedy? We believe they do. Under ERISA, AIRVAC's claims raise two questions. First, ERISA explicitly allows a plan participant to obtain an injunction or other equitable relief to redress a violation of the plan. If Blue Cross is correct, is Blue Cross correct then when it argues that plan participants in this situation have no remedy at all? No, wait, you don't represent any plan participants, right? We do by assignment. No, no, I mean, other than the assignment, I get that issue, but there's not a named plan participant in this case, right? Not one. Right. Okay, proceed. Yeah, so the patients of AIRVAC assign their claims to AIRVAC. So we are representing AIRVAC as the assignee of the patients. And for some of our claims, AIRVAC in its own right. Second, should a complete assignment of a plan participant's rights be read to be an incomplete assignment of some of its rights? We think the answer to both of those questions is no. Under the Arkansas Deceptive Trade Practices Act, there's one question. The Arkansas Insurance Commissioner has never approved Blue Cross's policy of not creating a network in violation of state regulations and federal regulations, nor has it ever approved the policy of not paying enough for out-of-network air transportation to ensure that the patients don't pay more than they would have paid had the provider been in network, which also violates Arkansas regulations. Are those unlawful practices that the insurance commissioner has never approved nevertheless specifically permitted by the insurance commissioner? The answer is no. What is the relief that you're seeking? I assume it can't be that Blue Cross has to pay the full $45,000 for an out-of-network. Is it? It varies by claim. For our claims under ERISA, we are seeking reformation of the plans to make sure that because that is what federal law requires. The form of that, and we are not asking this court to actually go and take a red pen and change the plan. One way to do that would actually be for this court or the district court to say, here's what the law requires of you. Now you are enjoined to go change your plan to comport with it. For the other claims, for claims that are not subject to ERISA, what we are asking is that Blue Cross be required to pay enough to air EVAC so that the remaining liability to the plan participant, or I should say the insured because these are insurance claims, be no more than their co-payment, co-insurance, and deductible, whatever they would owe to an in-network provider. For those claims, we are seeking the difference between the bill charges and the patient's responsibility under their insurance plan. One of the main arguments here, and really dug into some very old treatises was, is reformation even available in a situation like this? The answer is yes, and this court said that the answer is yes in a case that Blue Cross relies on, on page 17 of its brief, Ross v. Railcard. In that case, a participant in a disability program under ERISA had his payments cut off because they had expired, and he said that that cutoff date had been imposed through an unlawful amendment to the plan. What this court said was, he's seeking reformation of the plan, and to seek reformation of a plan because the plan term violated ERISA, you have to bring that claim under Section 502A3 of ERISA, which is exactly what we're doing. That case is emblematic of several cases that we cite in our brief, which are commonly known as the whipsaw cases, because they have to do with what's beyond my knowledge exactly how it works, but it has to do with whipsaw calculations of the cash balances in an ERISA pension plan. In these cases, which are fairly common, people say that the way that the plan said that their cases, the courts have said that the plans themselves can be reformed to comply with ERISA. Before you get too deep in your time, you are saying that three forms of the assignment give you the rights to bring the case, in fact. That's correct. I get it that they all say all rights to, but does the next limited so any benefit claims and or payments that you can't ask for reformation or to put it differently, do you have to specifically say a little more in that to even get going? No, you don't for a few reasons. One is if you just want to rely on precedent, you can look at the several cases we cited in which people were allowed to bring claims for reformation under 502A3 for violations of the plan, assignees even. What's your closest case? I'm sorry, because I saw the ones, but say it again. The Riverview case from the District of Minnesota, the relevant language from that case is Riverview nevertheless contends that it has standing to bring this action because patients have executed a standard assignment of medical benefits form, which among other things, assigns to Riverview any causes of action against the health insurer or insurers arising from my contractual rights arising out of the procedure provided by Riverview. It does use the magic word causes of action. Thanks for quoting it. It does, but there are others that don't. What's the best one? Go ahead, Ed. The Shaw case out of the District of New Jersey, and by the way, while I find you the specific language from Shaw, we said in our opening brief that one right associated with a benefit claim is the right to bring suit under Section 502A3 of ERISA, and that was But in the Shaw case, it says, I irrevocably assign to you, my medical provider, all of my rights and benefits under my insurance contract for payment for services rendered to me. I authorize you to file insurance claims on my behalf for services rendered to me, and this specifically includes filing arbitration litigation in your name on my behalf against the PIP carrier, healthcare carrier. As the district court noted, our assignment language also includes the right to bring litigation, just like in the Shaw case. Can I follow up on Judge Benton's question? In this one, it is to all rights, and then it defines rights to and related or associated with any benefit claims and or payments due. Is that the core? Does that include the kind of thing that you're requesting now? It does. And why? Because when you make a benefit claim under ERISA, your rights are your ERISA rights. You really don't have any others. ERISA preempts state law, and so your right to bring a suit under Section 502A1 for benefits due under the plan or Section 502A3, those are all rights associated with the benefit claim, and benefit claim is different from payment in this case because two different terms are used. So it's intentional that it's more than just the right to payment. It's rights associated with benefit claims, and as I mentioned, there was no dispute that the right to bring a suit under Section 502A3 of ERISA is a right associated with benefit claims under ERISA. I'd like to skip to the common law points if I could because I want to make sure that there's no mistake about the differences between the situation here in the unjust enrichment claim and the situation that arises when just a run-of-the-mill, out-of-network provider  issues. There are two main differences. One is that in the run-of-the-mill situation, let's say you're just an out-of-network dermatologist and the insurance provider has plenty of dermatologists in network. You can choose whether to see, let's say you're not in Blue Cross's network. You can choose whether to see Blue Cross patients or not. If you do, you're making the choice that you're going to take what Blue Cross pays you for those out-of-network services. Arivac doesn't have a choice. Arivac is called to the scene of an accident or to a hospital by a first responder or medical professional and by law has to pick up whoever it gets regardless of their insurance coverage or lack thereof. So they have to provide the service. They don't get to choose. Blue Cross has an obligation to make these services available through a network and doesn't, which is different from the situation where you've got a network and if anybody's going out of network, it's because they chose to. Here they have to make the service available through network providers and they have this extra requirement that doesn't apply to say you're out-of-network dermatologist that if no in-network provider is available, they have to pay enough to make sure that the insured doesn't pay any more as a result. They've chosen not to do that either. So we have a situation like my original example where by the way, so in that, I think what happened in that case was the patient's family agreed to pay $13,000 because that's all they reasonably could pay under the circumstances. So they paid more than they had to under the law and Arivac got far less than it was entitled to under the law. You bring up a question I meant to ask you earlier. As in Missouri, like you do in Missouri, Arivac, like Arivac, do you have subscriber arrangements in Arkansas too, Arivac? I cannot recall. In some states, Arivac has subscriber arrangements and some they don't. I don't know. I don't know. We'll find out. It's publicly available. It's been exposed several times. Go ahead. But I see I'm into my rebuttal, so I will. You may reserve the rest. Mr. Shelley? Thank you. Good morning and may it please the court. I'm Anthony Shelley here on behalf of the Appley U.S. Able Mutual Insurance Company, which I refer to as Blue Cross. In my time, I'd first like to address a theme that pervades Arivac's briefing and Mr. Quillen's presentation and then turn in detail to the ERISA and the ADTPA claims. A key theme that the other side raises is that if the court does not reverse the dismissal here, there will be no remedy anywhere for supposedly serious illegality. That's patently untrue. There's government enforcement, and that's what Congress and the Arkansas legislature intended. Blue Cross is subject to layers and layers of regulation from the local insurance commissioner to the local exchange regulators to the U.S. Department of Labor to the U.S. Department of Health and Human Services. All of them regulate the practices at issue in this case. None of them have found anything wrong. Can participants sue you? Participants can sue us under ERISA and not under the ADTPA. They cannot just like Arivac cannot because of the safe harbor. But participants could bring a claim for violation of the terms of the plan. They could bring claims for A3 relief, but Arivac cannot bring claims for A3 types of relief. So I'd like to turn then to the ERISA claims. Before you get off that issue, what is your response to the argument that your opponent sort of opened with that there's clear illegality here because the statute's clear you have to at least pay the Medicare reimbursement rate and you're only paying $1,000? Our position is there's no illegality at all. First of all, their theory rests on their services being deemed essential health benefits, which they are not on the ERISA side of things. Their theory rests on those being emergency services, and they're not. They're ambulance services as opposed to emergency room services. Their theory rests on a local regulation about provider networks that applies to only one small segment of plans, which are the exchange types of plans, individual exchange plans. And even there, the regulation on provider networks doesn't apply when it's impossible or difficult to set up a provider network here. The idea that, in reality, we're played out as the bad actor, but our view is that the prices that the AIR EVAC wants to charge are so high that no network can really be created at a reasonable price. But that even would still only apply to a small segment of the claims, which is the exchange claims. The regulation that Mr. Quillen has touted over and over again is inapplicable to ERISA cases, which ERISA preempts state law, and it's inapplicable even to group coverage under state law. So we take the position that there are no violations of law. And the idea, too, that there are annual limits on these, that we somehow have violated some prohibition on annual limits, that only applies, first of all, to essential health benefits, which their ambulance services are not. And second of all, that regulation doesn't apply to treatment limits. Here, the provision is balled up in a treatment limit, not an annual pricing limit. On the ERISA claims, the court already delved into the language of the assignment, and this court has never found that a provider assignee can bring a 502A3 claim, as opposed to a 502A1B claim. Nor are we aware of any court of appeals. In our Ibsen case, there's no assignee. Is that what you're telling me? I believe that's the case. Grasso was an assignee case, and Lutheran Medical was an assignee case. Neither of those cases is an A3 case. In Grasso, for instance, the court held that when it was dealing with derivative standing, which is the assignee standing, it dealt only with 502A1B, said it didn't need to get to 502A3. In the Lutheran Medical case, that was a 502A1B case. Our case comes closest to the Spinodex case out of the Ninth Circuit, or the Rojas case out of the Second Circuit, or the DB Healthcare case out of the Ninth Circuit. Mr. Quillen has cited a couple of district court cases which I could take issue with, but those three circuit cases come closest to the language of this assignment, particularly the Spinodex case where rights and benefits were assigned. The court said that doesn't give you the right to anything but a 502A1B claim. You can't go and try to bring a fiduciary breach claim under 502A3, or, in our case, the very extraordinary remedy of rewriting the plans the employers agreed to. That's not anything that the language sort of taken in its full context could possibly cover. There's no indication that the employees wanted to give the right to a provider in its own self-interest, trying to change the terms of the employer plan in the relationship. The case that you relied on in talking about the fiduciary duty, is that sort of a fundamentally different kind of claim, though, than what he's alleging or asserting is in a benefit claim or payment, a right to benefit claim or payment? Isn't that distinguishable that maybe that might not include a right to bring a claim on a breach of fiduciary duty? So is that on point in this particular situation? I don't think it's distinguishable because it's a 502A3 claim. Reformation can't be had under 502A1B. So it really is the difference between what types of relief are available under 502A1B and what types of relief are available under 502A3. While they didn't sue for breach of fiduciary duty, because we're not a fiduciary in many of these instances, the relief they've sought is the type that, in the theory, is the type that can only be pursued under A3. For instance, under 502A1B, the relief available is benefits due under the terms of the plan, clarification of rights under the terms of the plan. Those types of things don't apply when you're trying to rewrite the plan. Much like the fiduciary breach cases, you have to turn to 502A3 to get the relief. What about the words in the assignment that say, pursue litigation in order to obtain payment? That's pretty broad. How do you get around that? Well, it's very much like what the language was in SpinaDex, where the court said the assignments are, you begin with the presumption that an assignment gives only limited rights, because the assignee, the assignor, only knowingly would give away the most limited amounts, seemingly. The court, the cases say narrow interpretation is the rule. And so when you get to litigation regarding benefits, the case law prior to these assignments, in fact, indicates that's benefits due under the terms of the plan, the typical, ordinary benefits type of claim. That's what an assignor would understand to be at issue. It requires more, and I think Your Honor put it before, you need a little bit more in order to get to what AIR-EVAC wants to say, and it does. I'm not saying that AIR-EVAC could even get there under 502A3 if it had an assignment that said, and I'm entitled, and I assign my rights to equitable relief, my rights to extraordinary, appropriate equitable relief, my rights against the employer or that affect the terms of my plan. That would be something that could have been put in the assignment. I'm not sure it would be actionable because you'd have to then, under federal common law, say that an assignee with that type of assignment gets to use 502A3, and the Supreme Court doesn't like these expansions on 502 to begin with, and to do it via federal common law makes it difficult. Well, in Cigna, though, they said appropriate equitable relief means everything that's ever been in equity, so I don't know that they would say it's so narrow. The U.S. Supreme Court? Yeah, that's Cigna 2011. Versus NARA? Yeah, yes, Your Honor. Agreed that the term appropriate equitable relief is somewhat elastic and now includes certain things like surcharge, disgorgement, reformation, but you have to get it under 502A3, and what I was indicating was that it's not clear the Supreme Court would say, we're going to expand 502 to say that more than just participants, beneficiaries, and fiduciaries can sue under 502A3. Instead, we're now going to expand it under federal common law to say that assignees of those rights can also sue. They're not mentioned. The word assignee is mentioned nowhere in Section 502, but they want to read it as covering them for the whole panoply of rights that a participant. But you don't have any authority on that either way, right? Correct. The Supreme Court's never had an assignee case. So our position is that, like Spinodex, like Rojas, the assignments aren't expansive enough to give 502A3 relief. Instead, they're only expansive enough to get 502A1B relief, which this case isn't. That was a claim in the original complaint, but they couldn't really pursue it. It was not actionable, and so they left it out of the second complaint. The other theory for affirming the dismissal of the ERISA claims is that reformation is not an appropriate remedy here, and that is because they're attempting to correct what is alleged to be illegal activity. Old equity courts, and it takes a while in the briefing to spin this out because you have to go through so many old equitable treatises, they would reform a contract for mutual mistake or fraud, not when a contract was supposedly illegal. We believe we've got the better side of that. It doesn't have to be illegal by both sides. Pardon me? Okay, and old equity doesn't have to be both people are illegal, like two people betting and it's against the law to bet, get it? If one side's illegal, they can reform it, right? Well, if one side tells the other side, here's what the law requires and dupes the other side into thinking that the law is what the one side is saying, perhaps that would be a fraud case. But here the duping would have to be between two sophisticated actors, the employer, not that we're not talking about participants, we're talking about employers and the insurance company. And the treatises say that if both of them are mistaken on the basis of the law, the court doesn't reform the contract because it would then set up a contract that neither party expected. Instead, it might rescind the contract or come up with some other remedies, but not reformation. And Justice Ginsburg in her dissent, I think in the Montanil case said, all of this is very bizarre. It's very bizarre that we're looking back at the 1930s or earlier to figure out what the relief is, but that's what ERISA contemplated, according to the majority, of course, in that opinion. And it may seem that equity had only limited remedies and why would you want to transplant those here, but that's what the Supreme Court has said. On the reformation point, the only other thing I wanted to point out was that in their reply brief, they raised a series of points that we didn't have a chance, obviously, then to respond to. And one was that the usury cases somehow set up some special precedent. Well, they're special because they were governed by statute, first of all, and the courts there do not – that's not a good example of what courts would do in the main for reformation. We would point, if the courts were going to consider the usury cases, we would point to our document 33 below, pages 12 to 15, where we fully explain why the usury cases don't apply in this particular situation. I'd like also – one other point is they cite the Dobbs Treatise for one that supposedly allows reformation in these circumstances, but Dobbs is the oldest treatise – excuse me, the youngest treatise. It's from 1993, and it talks about nontraditional equity practices, not the traditional ones that matter. And even in the usury cases, what was occurring there was, if a contract was usurious, the court might lower the rate to one that was subsumed in the contract, but it would never add to the rate. It would never add terms to the contract. They would downright, but they would never upright, which is what EIR-EVAC wants. On the ADTPA claims, those were governed by the safe harbor, according to the district court. Here's the language of the safe harbor. The ADTPA does not apply to actions or transactions permitted under laws administered by the insurance commissioner and certain other state agencies and federal agencies. Does it have specifically permitted? It didn't in the version governing this law. Oh, that's a change in the law. It's a change in law, but then the Arkansas Supreme Court said that even under the earlier version, they were going to adopt the later version as a clarification of the earlier version. It now says specifically permitted, but the language in the original was permitted. But it says if it's permitted unless the director of the division here, the insurance commission, specifically requests the attorney general to implement the powers of this chapter. So the safe harbor doesn't give Blue Cross carte blanche or absolvative liability entirely. It simply leaves to the insurance commissioner the decision with the possibility that the attorney general could enforce, and here there was no request at any point by the insurance commissioner to go to the attorney general. The safe harbor applies because the amended complaints allegations challenge the policy terms and the rates. There's a dispute as to whether their complaint does that among us, but the district court didn't find that to be a dispute. The district court found it to be found that, in fact, the complaint in these parts does exactly challenge the terms of the policy and the rates that were presented to the insurance commissioner and approved by the insurance commissioner. And I point particularly to the joint appendix, page 52, paragraphs 79 to 81, where AIR-EVAC specifically says the deception in this case that's actionable under the ADTPA is the terms of the plan. They deceive the subscribers into thinking one thing when something else is actually occurring. Those are plans that... You used the word subscribers. In Arkansas, do they have subscribers? We have... No. Does AIR-EVAC have subscribers in Arkansas? I don't know if... Okay. Proceed. I use subscribers as our insureds or the participants in the employer plan. Yeah, but it reminded me of ask about theirs. Go ahead. Sure. But in order to use the ADTPA, there has to be a deception, and here the deception is the plan document that was submitted to the insurance commissioner. The only other allegation that really comes out of the ADTPA vermin is that Blue Cross is getting some unconscionable windfall in its rates by not providing what it leads people to believe it's going to provide, namely air ambulance networks, and that's a challenge to the rates. In other words, we're charging a premium that is creating windfall because we're not getting what we're explaining the premium is supposed to pay for, and that comes at paragraph 92 of the amended complaint. These are all challenges to the filed rates and policies that the commissioner reviewed and, therefore, within the purview of the ADTPA's safe harbor. They do mention church plans at one point and say they might have found one church plan claim that is not an insured claim, and it's a self-funded claim, but their own complaint would kill that claim because they note that the network access rule under Arkansas law applies only to carriers who are insurers, and that comes at paragraph 53 of their amended complaint where they say it doesn't apply in self-funded situations. It applies only where Blue Cross acts as a health carrier, and Blue Cross isn't a health carrier in a self-funded church plan. It's only a claims processor because it is the self-funded plan that carries the risk. It's not an insurer in that situation. So under their own complaint, paragraph 53, their church plan case isn't actionable at all because it doesn't fall within the ADTPA. Is the reply brief the first time that church-affiliated plans have been mentioned in this litigation? I don't think it was mentioned anywhere in the district court. It's conceivable it was mentioned at some point in the Arkansas Supreme Court, but in the district court litigation, it was never mentioned. And importantly, once we were done in the Arkansas Supreme Court, I asked the district judge for further briefing so we could explain why we still win after the Arkansas Supreme Court, and Air Evac said no, no more briefing. They didn't want to raise anything else. We shouldn't be allowed to raise anything else, and the district judge went with them and said no more briefing. I have enough in front of me, and I have all the briefs, plus what was in front of the Arkansas Supreme Court, and Blue Cross can rely on whatever it put in the record so far, but nothing further. And now it comes here to say, well, we should have noted to the district judge that there was this self-funded church plan claim. And so our point would be it's waived. It's waived, but in any event, it doesn't fall under the network access rule because it's a self-funded claim as opposed to an insured claim.  You said that these are not emergency services and that they're basically routine ambulance services and so on and so forth. Assuming that Air Evac or a planned participant disagrees with that or disagrees with your reimbursement, and I think you said there were remedies. Remind me, what are the remedies? If they think that you should be reimbursing at least at the Medicare rate or they think there's something else that you're doing wrong under some federal or state statute, do they have a remedy? They don't have a backward-looking remedy. They would only have a remedy going forward because the only remedy they would have in the ERISA situation would be reformation under A3, but reformation doesn't exist to reform a contract that's illegal. Instead, they would only have a forward-looking remedy. They could bring a suit on behalf of the plan, not necessarily themselves, but on behalf of the plan to get forward-looking relief in that situation. Any backward-looking relief would be up to the insurance commissioner, the Department of Labor, Department of Health and Human Services, or the exchange regulators. They can dispute a claim, though, right, if you send them a notice of denial? Of course, of course, under the terms of the plan. They could dispute that. They'd have to argue that the terms of the plan required more than a $5,000 payment. That would be the A1B claim. If they want to say that the plan is illegal, the employer set up an illegal plan with the insurance company's help, that's not something they can pursue. They'd have to get backward-looking. They could pursue it forward-looking. If they wanted backward-looking relief, they'd have to go to government regulators. But they could sue under the terms of the plan that you weren't paying the benefits that you had contracted to pay, and they could have signed that claim to the provider. The employer could, and that's why they left it out of the amended complaint, because we win. Because under the terms of the plan, we were required to pay $5,000, and we did. The front two pages of the insurance plan note that this doesn't cover everything. We cover what we're required to cover, that the insurance commissioner says we're required to cover, federal law says we're required to cover, but we can't cover everything, and the employer's made a balancing of what should be paid and what shouldn't be paid. I see my time is almost up. The one last point I wanted to make is we haven't at all talked about the filed-rate doctrine, which is at the very end of the brief, but I wanted to point out that there are a series of arguments that are made in their reply brief again on the filed-rate doctrine, which were fully addressed again in our document 33 below, and those at pages 27 through 31, where we showed why each and every one of these reply arguments shouldn't be followed. So with that, I would say that the district judge got things right on every claim here, and the court should affirm him. Okay. Thank you for your argument. Mr. Quillen? Before I forget it, I'll just point out that the church plan argument was on page 41 of our opening brief, and the reason that it wasn't argued in the district court was because there was an intervening change in the law by the U.S. Supreme Court between the time that we briefed it to the district court. But it was before the Arkansas Supreme Court ruled. It was in 2017. The Arkansas Supreme Court didn't rule until December 2017, correct? That's correct. Percy. But that issue was not part of the appeal to the Arkansas Supreme Court. I'm glad that he brought up Spyndex and Rojas and DB Health Care, because you can look at the assignment language in each of those cases to see how vastly different it is from the one in our case. In Spyndex, the court said, in relevant part, the assignments provided that the plans would make payments directly to Spyndex for services rendered. Any such payments would be considered, quote, payment toward the total charges of professional services rendered. This is a direct assignment of my rights and benefits under this policy. What the court says was, in context, they are only talking about payments here. That's what the very first sentence says. So everything that comes after that is just clarifying what the earlier sentence has said about payment. In Rojas, the assignment says, I, the undersigned, have insurance coverage with, and then they fill in the blank, and assigned directly to Rojas and Rose and MD, all medical benefits, if any, otherwise payable to me for services rendered. I understand that I am financially responsible for all charges, including those related to physical examinations, whether or not paid by insurance. Again, only about payments. That's why the court said you don't get to bring a fiduciary duty claim under 502A3 because the assignment only covers payments. And in DB Health Care, it says, and this is the entirety of the language that the court quoted, I hereby authorize my insurance benefits to be paid directly to the physician. That was it. So in those cases, every single one of them, payments were the only thing at issue. So if you look at our language versus those, there's really no comparison. If you look at our language versus the Shaw case and some of the other ones that we have assigned, or some of the other ones that we have cited in our brief, you'll see that ours are much closer to those. And I recommend Shaw because it has the most thorough and thoughtful discussion of the issue of any of the cases that either party has cited. I want to talk about old equity because it seems like we've ignored the idea of constructive fraud, that if you put an illegal term in a contract, that always, going back to the 1800s, was considered constructive fraud. And that's why usury was, usurious contracts were able to be reformed even though there was no deception involved. The person who borrowed knew exactly what they were getting into, but they could get it reformed anyway. And they have, and I won't go through all the citations in our brief, but we go through every single treatise that Blue Cross submitted to the district court and show where in that treatise it talks about constructive fraud and it talks about the ability to reform unlawful contracts. And I didn't hear a response at all to the Whipsaw cases, which apparently, if Blue Cross is right, were all decided incorrectly, and the people in those cases had no remedy, should have had at most some sort of forward-looking injunctive relief, but that's not what happened. They were able to, if the merits supported it, they were able to recover back benefits as incidental to the reformation of the contract. And the argument that you can, in this situation, that you can only get forward-looking injunctive relief, as opposed to payment that results from reforming a contract, is the exact argument that Judge Posner called silly in the Johnson v. Meritor case, which is cited in our brief, which was another one of these Whipsaw cases. He said, if you reform the contract, then you go back and you recalculate the benefits and you pay people what they're owed. You don't have some forward-looking relief only. And actually, when an issue like this came up in the district court and what Blue Cross said was, well, plan members wouldn't have standing to bring injunctive relief that's forward-looking because they don't know if they're going to be transported again. So what they say is the one remedy they have, they said in the district court they don't have. With my last 45 seconds, I'd like to talk about what I think is a mischaracterization of one of our ADTPA claims. First, there are two ADTPA claims. One is for unconscionable practices. That's brought on behalf of AIREVAC, and I didn't hear that addressed. The other is on behalf of the insureds who have been deceived. And we clarified from the beginning in our briefing with the district court that that was not based on the terms of the plan, that the deceptive conduct was actually the failure to create a network and the failure to follow state law regarding how you pay people when you don't have a network. And you can look at the language in our brief for the rest of that discussion. Thank you. Thank you both for your argument. Case number 18-2264 is submitted for argument. The court will stand at recess for about 10 minutes.